# CASE NO. 23-14050-A

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____/

In Re:
LORENZO ESTEVA,

Debtor.

_____/

LORENZO ESTEVA, a Florida resident,
DENISE OTERO VILARINO, a Florida resident,

     Plaintiffs-Appellees,

v.

UBS FINANCIAL SERVICES, INC., a foreign corporation and UBS CREDIT CORP., a foreign corporation,

     Defendants-Appellants.

_____/

On Appeal From Orders of United States Bankruptcy Court (Laurel M. Isicoff, U.S.B.J.)

Case No.: 18-16645-LMI
Chapter 11

Adv. Pro. No. 19-01047-LMI

---

## 𝕬𝖕𝖕𝖊𝖑𝖑𝖆𝖓𝖙𝖘' 𝕺𝖕𝖊𝖓𝖎𝖓𝖌 𝕭𝖗𝖎𝖊𝖋

---

Alex J. Sabo, Esq.
Florida Bar No.: 262821
**BRESSLER, AMERY & ROSS, P.C.**
515 East Las Olas Boulevard, Suite 800
Ft. Lauderdale FL 33301
Phone: (305) 501-5480
Fax: (305) 501-5499
Email: asabo@bressler.com
_Counsel for Defendants-Appellants UBS Credit Corp. and UBS Financial Services, Inc._

i

## Certificate of Interested Persons and
## Corporate Disclosure Statement

Defendants-Appellants UBS Credit Corp. and UBS Financial Services, Inc., submit their Corporate Disclosure Statement and state that both UBS Credit Corp. and UBS Financial Services, Inc. are wholly owned by UBS Americas Inc., which is wholly owned by UBS Americas Holding LLC.  UBS Americas Holding LLC is wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded corporation.  No publicly held corporation owns 10% or more of UBS Group AG stock.

1. AM Law (Counsel for Appellee, Lorenzo Esteva);

2. Bressler. Amery & Ross, P.C. (Counsel for Appellants UBS Credit Corp. and UBS Financial Services, Inc.);

3. Cooke, Hon. Marcia G. (United States District Judge);

4. Esteva, Lorenzo (Appellee/Debtor);

5. Foodman, Daniel (Counsel for Appellee, Denise Otero Vilarino);

6. Isicoff, Hon. Laurel M. (United States Bankruptcy Judge);

7. Murphree, Gary M. (Counsel for Appellee, Lorenzo Esteva);

8. Otero Vilarino, Denise (Appellee);

9. Pikus, David H. (Counsel for Appellants UBS Credit Corp. and UBS Financial Services, Inc.; Admitted via Pro Hac Vice);

10. Sabo, Alex J. (Counsel for Appellants UBS Credit Corp. and UBS Financial Services, Inc.);

11. Soto, Sara (Counsel for Appellants UBS Credit Corp. and UBS Financial Services, Inc.);

12. The Foodman Firm (Counsel for Appellee, Denise Otero Vilarino);

13. UBS AG (Wholly owned by UBS Group AG, a publicly traded corporation (Ticker symbol:  UBS).

14. UBS Americas Holding LLC.  (Wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded corporation (Ticker symbol:  UBS).

15. UBS Americas Inc. (Wholly owned by UBS Americas Holding LLC. UBS Americas Holding LLC is wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded corporation (Ticker symbol:  UBS)

16. UBS Credit Corp. (Wholly owned by UBS Americas Inc., which is wholly owned by UBS Americas Holding LLC.  UBS Americas Holding LLC is wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded corporation (Ticker symbol:  UBS). (Appellant);

17. UBS Financial Services, Inc. (Wholly owned by UBS Americas Inc., which is wholly owned by UBS Americas Holding LLC.  UBS Americas Holding LLC is wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded corporation (Ticker symbol:  UBS).  (Appellant);

18. UBS Group AG, a publicly traded corporation (No publicly held corporation owns 10% or more of UBS Group AG stock.) (Ticker symbol:  UBS)

Dated:  January 25, 2024

Respectfully submitted,

/s/ *Alex J. Sabo*_____
Alex J. Sabo, Esq.
Florida Bar No.: 262821
**BRESSLER, AMERY & ROSS, P.C.**
   515 East Las Olas Boulevard, Suite 800
   Ft. Lauderdale FL 33301

Phone: (305) 501-5480
Fax: (305) 501-5499
Email: asabo@bressler.com
*Counsel for Appellants UBS Credit Corp.*
   *and UBS Financial Services, Inc.*

iv

**Statement Regarding Oral Argument**

Appellants request oral argument.  Oral argument should be heard to help explain why the various sections of the parties' 23-page Customer Relationship Agreement, with which Respondent Esteva was intimately familiar and worked in his daily employment with UBS Financial Services, operate to establish a security interest in Respondents' account.  Oral argument will also assist in addressing how the facts of this case fit within the complex provisions of the Florida fraudulent transfers statutes.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT....................................................................................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ................................................ v

TABLE OF CONTENTS............................................................................................... vi

TABLE OF AUTHORITIES ...................................................................................... vii

JURISDICTIONAL STATEMENT ........................................................................... 1

STATEMENT OF THE ISSUES PRESENTED AND CONCISE STATEMENT OF THE APPLICABLE STANDARD OF APPELLATE REVIEW . . . . . . . . . . . . 1

STATEMENT OF THE CASE......................................................................................2
    A.  FACTS RELEVANT TO THE ISSUES ..................................................3
    B.  PROCEDURAL HISTORY ........................................................................7
    C.  RULINGS PRESENTED FOR REVIEW .................................................9

SUMMARY OF THE ARGUMENT ........................................................................10

ARGUMENT ................................................................................................................12

    I.       THE AWARD OF SUMMARY JUDGMENT BELOW WAS CONTRARY TO THE EXPRESS WRITTEN PROVISIONS OF THE PARTIES' AGREEMENTS............12
    II.     COUNT 3,SEEKING TURNOVER, FAILS AS A MATTER OF COURSE ...........27
    III.    THE DEPOSIT OF THE UBS LOAN PROCEEDS INTO THE JOINT ACCOUNT WAS A FRAUDULENT TRANSFER.......................................................................28
    IV.    UBS HAS A RIGHT OF SETOFF IN TANDEM WITH ITS SECURITY INTEREST.......................................................................................................................43
    V.     SUMMARY JUDGMENT ON COUNT 4 OF THE COMPLAINT MUST FALL IN LIGHT OF THE UBS LIEN...................................................................................45
    VI.    SUMMARY JUDGMENT WAS IMPROPER IN THE FACE OF QUESTIONS OF FACT ................................................................................................................................46
    VII.   THE COURT HAS JURISDICTION TO HEAR THIS APPEAL..............................48

CONCLUSION...............................................................................................................53

CERTIFICATE OF COMPLIANCE WITH WORD COUNT ....................................53

CERTIFICATE OF SERVICE ..................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advest, Inc. v. Rader*,
　743 F. Supp. 851 (S.D. Fla. 1990) ........................................................50

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986) ...............................................................................38

*Automobile Sales, Inc. v. Federated Mut. Implement & Hardware Ins. Co.*,
　256 So.2d 386 (Fla. 3d DCA 1972) .......................................................36

*Bartenwerfer v. Buckley*,
　598 U.S. 69 (2023) .................................................................................44

*Berkeley Research Group, LLC v. FTI Consulting, Inc.*,
　157 A.D.3d 486, 69 N.Y.S.3d 26 (1st Dep't 2018) ...............................23

*Bianco v Bianco*,
　36 A.D.3d 490, 830 N.Y.S.2d 21 (1st Dep't 2007) ...............................17

*Brad H. v. City of New York*,
　17 N.Y.3d 180, 951 N.E.2d 743, 928 N.Y.S.2d 221 (2011)...................22

*In re Brooks*,
　2013 Bankr. LEXIS 5571 (Bankr. N.D. Fla. 2013) ...............................13

*Brown v. Brown*,
　2013 U.S. Dist. LEXIS 74323 (E.D. Ky. 2013)......................................40

*Bunnell Med. Clinic, P.A. v. Barrera*,
　419 So.2d 681 (Fla. 5th DCA 1982) ......................................................13

*In re C.D. Jones & Co.*,
　2016 Bankr. LEXIS 3127 (Bankr. N.D. Fla. 2016) .........................14, 25

*Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program*,
　129 F.3d 581 (11th Cir. 1997) .................................................................1

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986)..........................................................................38, 49

*Chapman v. AI Transp.*,
　229 F.3d 1012 (11th Cir. 2000) (en banc) ...........................................1, 2

*City of Orlando v. H.L. Coble Constr. Co.*,
  282 So. 2d 25 (Fla. 4th DCA 1973) .................................................13

*In re Cooper*,
  81 N.C. App. 27 (1986) ...............................................................40

*Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*,
  126 F.3d 823 (6th Cir. 1997) .................................................29, 30

*In re Dillard Ford, Inc.*,
  940 F.2d 1507 (11th Cir. 1991) ....................................................46

*Dreisinger v. Teglasi*,
  130 A.D.3d 524, 13 N.Y.S.3d 432 (1st Dep't 2015) ........................24

*Ebsary Found. Co. v. Barnett Bank of S. Fla., N.A.*,
  569 So.2d 806 (Fla. 3d DCA 1990) ...............................................47

*Esteva v. UBS Financial Services, Inc.*,
  60 F. 4th 664 (11th Cir 2023) .........................................................2

*Evans v. Robbins*,
  897 F.2d 966 (8th Cir. 1990) ........................................................29

*Fernandez v. Price*,
  63 A.D.3d 672, 880 N.Y.S.2d 169 (2d Dep't 2009) ....................22, 23

*Fisher v. PNC Bank, N.A.*,
  No. 21-13266 (11th Cir. Jun. 7, 2022) ...............................17, 18, 19

*In re Fundamental Long Term Care, Inc.*,
  500 B.R. 140 (Bankr. M.D. Fla. 2013) ............................................36

*Garcia v. GMRI, Inc.*,
  2013 U.S. Dist. LEXIS 189381 (C.D. Cal. 2013) ..............................15

*Garrett v. Faulkner (In re Royal Crown Bottlers, Inc.)*,
  23 B.R. 28 (Bankr. N.D. Ala. 1982) ...............................................35

*Garver v. Garver*,
  253 A.D.2d 512, 677 N.Y.S.2d 155 (2d Dep't 1998) .........................40

*Geron v. Schulman (In re Manshul Constr. Corp.)*,
  2000 U.S. Dist. LEXIS 12576 (S.D.N.Y. Aug. 30, 2000) ...................34

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) ......................................................................39

*Hanson v. Polk County Land, Inc.*,
608 F.2d 129 (5th Cir. 1979) ............................................49

*Havoco of Am., Ltd. v. Hill*,
197 F.3d 1135 (11th Cir. 1999) ........................................13

*Hickson Corp. v. N. Crossarm Co.*,
357 F.3d 1256 (11th Cir. 2004) ........................................49

*Inland Bulk Transfer Co. v. Cummins Engine Co.*,
332 F.3d 1007 (6th Cir. 2003) ..........................................20

*Kapila v. Suntrust Mortg. (In re Pearlman)*,
515 B.R. 887 (Bankr. M.D. Fla. 2014) ..............................31

*Kim v. Yoo*,
311 F.Supp.3d 598 (S.D.N.Y. 2018), *aff'd*, 776 Fed. Appx. 16 (2d Cir. 2019) ....................34

*Kinko's, Inc. v. Payne*,
901 So. 2d 354 (Fla. 2d DCA 2005) ..................................15

*Lawrence v. Chapter 7 Trustee (In re Lawrence)*,
251 B.R. 630 (S.D. Fla. 2000) ..........................................29

*Maggio v. Zeitz*,
333 U.S. 56 (1948) ............................................................29

*In re MCB Fin. Group, Inc.*,
461 B.R. 914 (Bankr. N.D. Ga. 2011) ..............................47

*Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*,
750 F.2d 838 (11th Cir. 1985) ..........................................48

*Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*,
910 F.2d 784 (11th Cir. 1990) ..........................................54

*Morioka v. Nissin Travel Servs. (U.S.A.)*,
2018 U.S. Dist. LEXIS 219247 (E.D. Mich. 2018) ............15

*In re Moses*,
91 B.R. 994 (Bankr. M.D. Fla. 1988) ..............................46

*Moyer v. Geer (In re Geer)*,
522 B.R. 365 (Bankr. N.D. Ga. 2014) ..............................25

*Muzak Corp. v. Hotel Taft Corp.*,
1 N.Y.2d 42, 133 N.E.2d 688, 150 N.Y.S.2d 171 (1956) ....................22

*Nationsbank, N.A. v. Coastal Utils., Inc.,*
    814 So.2d 1227 (Fla. 4th DCA 2002) ........................................33, 36, 42

*Olympia Holdings Corp. v. Nat. City Bank of Columbus (In re Olympia Holding
    Corp.),*
    221 B.R. 995 (Bankr. M.D. Fla. 1998) ........................................29, 30

*Ossen v. Bernatovich (In re National Safe N.E., Inc.),*
    76 B.R. 896 (Bankr. D. Conn. 1987) ........................................35

*Pacamor Bearings, Inc. v. Minebea Co.,*
    918 F. Supp. 491 (D.N.H. 1996) ........................................38

*Palm Beach Pain Mgmt., Inc. v. Carroll,*
    7 So. 3d 1144 (Fla. 4th DCA 2009) ........................................13

*In re Patterson,*
    967 F.2d at 509 ........................................30, 46, 47

*Patton v. Cole (In re Cole),*
    2020 Bankr. LEXIS 3425 (Bankr. M.D. Fla. Dec. 7, 2020) ........................................39

*Perrott v. Frankie,*
    605 So.2d 118 (Fla. 2d DCA 1992) ........................................42

*In re Porter,*
    50 B.R. 510 (Bankr. E.D. Va. 1985) ........................................34

*In re PSI Indus., Inc.,*
    306 B.R. 377 (Bankr. S.D. Fla. 2003) ........................................32

*Reeves v. Sanderson Plumbing Products, Inc.,*
    530 U.S. 133 (2000) ........................................38

*Reid v. Wolf (In re Wolf),*
    595 B.R. 735 (Bankr. N.D. Ill. 2018) ........................................34

*Reigle v. Leinheiser (In re Leinheiser),*
    51 B.R. 164 (Bankr. E.D. Pa. 1985) ........................................35

*In re Reynolds,*
    151 B.R. 974 (Bankr. S.D. Fla. 1993) ........................................25

*Rhiel v. OhioHealth Corp. (In re Hunter),*
    380 B.R. 753 (Bankr. S.D. Ohio 2008) ........................................29

*Robbinson v. Central Properties, Inc.,*
    468 So.2d 986 (Fla. 1985) ........................................14, 25

*In re Roberge*,
  188 B.R. 366 (E.D. Va. 1995)........................................................39

*In re Rodriguez*,
  895 F.2d 725 (11th Cir. 1990) ......................................................31

*Ronnen v. Ajax Elec. Motor Corp.*,
  88 N.Y.2d 582, 671 N.E.2d 534, 648 N.Y.S.2d 422 (1996)...........22

*Rosenfeld v. Rosenfeld*,
  597 So.2d 835 (Fla. 3d DCA 1992) ...............................................40

<u>*Securities & Exchange Commission v. Spence & Green*</u>,
  <u>612 F.2d 896 (5th Cir. 1980)</u> ......................................................49

*Smith v. IndyMac Fed. Bank, F.S.B. (In re Winter)*,
  2010 Bankr. LEXIS 704 (Bankr. D.N.H. 2010) .............................21

*St. Charles Foods, Inc. v. America's Favorite Chicken Co.*,
  198 F.3d 815 (11th Cir. 1999) ......................................................23

*Steiner v. Steiner*,
  746 So.2d 1149 (Fla. 2d DCA 1999) .........................................40, 41

*Stephens v. Kies Oil Co., Inc.*,
  386 So. 2d 1289 (Fla. 3d DCA 1980) ............................................44

*Stern v. Marshall*,
  564 U.S. 462 (2011)................................................................54, 55

*In re Stewart*,
  280 B.R. 268 (Bankr. M.D. Fla. 2001) ..........................................31

*Strang v. Bradner*,
  114 U. S. 555 (1885)......................................................................45

*Sturm v. Moyer*,
  32 Cal. App.5th 299, 243 Cal. Rptr.3d 556 (2019)........................40

*Tuberville v. Fin. Indus. Regulatory Auth.*,
  874 F.3d 1268 (11th Cir. 2017) .....................................................3

*United States v. Gleneagles Inv. Co.*,
  565 F. Supp. 556 (M.D. Pa. 1983), *affd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005 (1987)................................34

*United States v. Key,*
    837 F. App'x 348 (6th Cir. 2020) .................................................34

*United States v. West,*
    299 F. Supp. 661 (D. Del. 1969) ..................................................35

*USF Fed. Credit Union v. Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.),*
    983 F. 3d 1239(11th Cir. 2020) ...................................................55

*Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.),*
    188 B.R. 287 (M.D. Fla. 1994) ....................................................29

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,*
    746 F.3d 1008 (11th Cir. 2014) ...................................................17

*Wortley v. Bakst,*
    844 F.3d 1313 (11th Cir. 2017) ...................................................54

**Statutes**

11 U.S.C. § 548(a) ............................................................................30

11 U.S.C. § 553 ........................................................................30, 46, 47

11 U.S.C. § 553(a) ..........................................................................46

28 U.S.C. §157(b) ...........................................................................53

28 U.S.C. §157(b)(2)(A) ....................................................................52

28 U.S.C. §157(b)(2)(A), (B), (E), (K) and (O)......................................51, 54

28 U.S.C. §157(b)(2)(B) ....................................................................52

28 U.S.C. §157(b)(2)(E) ....................................................................53

28 U.S.C. §157(b)(2)(K) ....................................................................53

28 U.S.C. §157(b)(2)(O) ....................................................................53

28 U.S.C. §158(a) and (d) ...................................................................1

28 U.S.C. §1334(b) ...........................................................................1

Bankruptcy Code Chapter 7 ........................................................7, 8, 9, 34

Bankruptcy Code Section 542 .......................................................29, 51

Fla. Stat. § 61.075(1) ........................................................................................41

Fla. Stat. § 726.102(8), (13) and §726.105 (2)(a) ...........................................42

Fla. Stat. § 726.105 ....................................................................................31, 33

Fla. Stat. §§ 726.105, 726.106 (2021) ...............................................................24

Florida Statutes Article 726 ...............................................................................11

N.Y. UCC § 8-106 ......................................................................................27, 28

N.Y. UCC § 8-106(e) .........................................................................................27

N.Y. UCC § 9-106 ......................................................................................26, 27

N.Y. UCC § 9-106(a) .........................................................................................27

N.Y. UCC § 9-106(c) .........................................................................................27

N.Y. UCC § 9-203 ..............................................................................................26

N.Y. UCC § 9-310 ..............................................................................................27

N.Y. UCC § 9-310(b)(8) ....................................................................................27

N.Y. UCC § 9-314 ..............................................................................................27

N.Y. UCC § 9-314(a) .........................................................................................27

UCC ...................................................................................................................14

Uniform Fraudulent Transfers Act .....................................................................40

**Other Authorities**

Fed. R. Bankr. P. 7054 .....................................................................................1, 2

Fed. R. Bankr. P. 7056 .......................................................................................48

Fed. R. Bankr. P. 8003 .........................................................................................1

Fed. R. Civ. P. 54(b) ........................................................................................1, 2

James Joseph Duane, *The Four Greatest Myths About Summary Judgment*, 52
    WASH. & LEE L. REV. 1523, 1591 (1995) ...............................................50

Julia Halloran McLaughlin, *Should Marital Property Rights Be Inalienable?*
    *Preserving the Marriage Ante*, 82 NEB. L. REV. 460, 463 n. 11 (2003) ...............................40

Order Certifying Determination of No Just Reason for Delay. Doc. 111....................................2, 5

Rule 56 .............................................................................................................38, 48, 49

Rule 56(f) .................................................................................................................50

Webster's Ninth New Collegiate Dictionary (Merriam-Webster 1991).......................................17

## JURISDICTIONAL STATEMENT

**(A)    The basis for the bankruptcy court's subject-matter jurisdiction, with citations to applicable statutory provisions and stating relevant facts establishing jurisdiction:**

The Bankruptcy Court had subject matter jurisdiction pursuant to 28 U.S.C. §1334(b).

**(B) The basis for appellate jurisdiction, with citations to applicable statutory provisions and stating relevant facts establishing jurisdiction:**

The order from which this appeal is taken, the Partial Final Judgment for Plaintiffs, constitutes a final order within the meaning of Fed. R. Bankr. P. 8003 and 28 U.S.C. §158(a) and (d).  The Bankruptcy Court has entered its Order Certifying Determination of No Just Reason for Delay under Fed. R. Civ. P. 54(b) and Fed. R. Bankr. P. 7054.

**(C) The filing dates establishing the timeliness of the appeal:**

The Bankruptcy Court's Order Certifying Determination of No Just Reason for Delay was entered on April 26, 2023.  The Notice of Appeal was filed in the District Court on May 10. 2023. This Court granted the Parties' Joint Petition for Direct Appeal on December 14, 2023.

**(D) This appeal is from a partial final judgment granting summary judgment in favor of Appellees and against Appellants.**

### STATEMENT OF THE ISSUES PRESENTED AND CONCISE STATEMENT OF THE APPLICABLE STANDARD OF APPELLATE REVIEW

1. Whether the Bankruptcy Court properly overrode the explicit and unambiguous language of the parties' written agreement, which granted Appellants a security interest in Appellees' joint account at UBS on behalf of both Appellees, jointly and severally.   This Court's review of the Bankruptcy Court's order is *de novo*.  *Chapman v. AI Transp*., 229 F.3d

1

1012, 1023 (11th Cir. 2000) (en banc); *Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program*, 129 F.3d 581, 584–85 (11th Cir. 1997).

2. Whether the Bankruptcy Court properly granted summary judgment in the face of an issue of intent to hinder, delay or defraud creditors, which, at the very least, implicated questions of fact. This Court's review of the Bankruptcy Court's order (Partial Final Judgment) is *de novo*. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

## STATEMENT OF THE CASE

This appeal arises out of an attempt by a malfeasant former UBS financial advisor, who now is barred from the financial services industry for life, to defraud his former employer, UBS, out of more than $2 million that he borrowed from Appellants under false pretenses and then deposited into a joint account with his wife.

This appeal comes to this Court as a direct appeal from the Bankruptcy Court. Following the decision in *Esteva v. UBS Financial Services, Inc.*, 60 F. 4th 664, 668 (11th Cir 2023), UBS filed Defendants UBS Financial Services, Inc., and UBS Credit Corp.'s Motion for an Order Certifying the Court's Determination that There is No Just Reason for Delay Pursuant to Fed. R. Civ. P. 54(b) and Fed. R. Bankr. P. 7054 with the Bankruptcy Court. [Appendix] Doc. 104. Appellees responded. Doc. 107. The Bankruptcy Court granted the motion and entered its Order Certifying Determination of No Just Reason for Delay. Doc. 111. This Court granted the parties' request for a direct appeal.

### A. FACTS RELEVANT TO THE ISSUES

Debtor and Appellee Lorenzo Esteva ("Esteva") is a former financial advisor, whose brief employment with UBS was terminated and who was banned for life from the financial industry by the Financial Industry Regulatory Authority ("FINRA") for serious misconduct.  Doc 47-1 – pp. 10-13(FINRA BrokerCheck Report)[1]; Doc 47-3 – pp. 1-5 (Esteva's AWC with FINRA).   The funds that are at issue in the bankruptcy proceeding are the proceeds **and security** for a thoroughly documented **loan** made to Esteva, to which he was entitled **if and only if** he maintained his employment with UBS.  Doc 29 – pp. 50-115. Esteva's bankruptcy case and the underlying adversary proceeding are part of his abuse of the bankruptcy system to consummate a fraudulent transfer to his wife, Appellee Denise Otero Vilarino ("Otero"), of funds that belong to neither spouse, but, instead, to UBS.  Doc 47-2 – pp. 1-3 (Declaration of Richard Maloney).

Esteva was hired by UBS in November 2015 after working with ostensible success at Merrill Lynch for approximately 24 years.  Doc 47-2 – pp. 1-3; Doc 47-1 – p. 6.  As part of Esteva's "recruiting deal," and as is  common in the securities industry, Esteva received certain employee loans and bonus commitments.  Esteva

---

[1] FINRA BrokerCheck is "an online database that contains a report on each currently and formerly registered broker. BrokerCheck Reports are available to the public." *Tuberville v. Fin. Indus. Regulatory Auth.*, 874 F.3d 1268, 1271-72 (11th Cir. 2017).

signed four promissory notes under which UBS agreed to loan him approximately $2 million, which was to be repaid by him in annual installments during the first ten years of his employment (the "Promissory Notes").  Doc 29 – pp. 50-81. (Promissory Notes); Doc 29 – pp. 82-113. (Transition Payment Award Agreements). Pursuant to the Promissory Notes, if Esteva's employment with UBS was terminated, any monies not already repaid became due and payable, with interest, at the time of termination.  *Id.* at 50-113 (*see, e.g.,* pp. 51, 59, 67, 75).

The borrowed funds, though loaned exclusively to Esteva, were deposited at Esteva's direction into a UBS account held jointly by Esteva and Otero (the "House Account").  *Compare* Doc 10 - p. 13, ¶¶19-20 *with* Doc 21 - p. 2, ¶¶19-20; Doc 47 – Pg 2-3.  The House Account is governed by a "Client Relationship Agreement" **signed by both Esteva and Otero** (the "CRA").  Doc 29 – pp. 26-48.  The CRA, by its terms, is to be construed under New York law. *Id.* at 38-39 (*Applicable Law*). Critically, **the CRA by its express terms granted UBS a security interest in the House Account on behalf of both Esteva and Otero, unequivocally covering the funds at issue in this case**.  *Id.* at 36 (*Security Interest*).  The CRA also imposed **joint and several liability** upon appellees for any underlying obligation of either spouse to UBS.  *Id.* at 34 (*Joint Accounts*).

At the time he incurred his obligation to UBS, Esteva was knowingly engaged in egregious securities law violations, undisclosed to UBS, that ultimately resulted

in a lifetime bar from the industry and concomitant ineligibility to earn a livelihood at UBS or elsewhere in the securities industry. Doc 47-1 – pp. 10-11. Fewer than two years after being hired by UBS, on June 6, 2017, UBS terminated Esteva's employment after an internal investigation determined that **he had falsified account statements and journaled funds between clients' accounts without permission for more than 16 years**. *Id.* at 23; *see also* Doc 47-3 – p. 2. On September 11, 2017, as a result of the charges, FINRA barred Esteva for life from working in the securities industry pursuant to a formal Acceptance, Waiver & Consent Agreement ("AWC"). Doc 47-3 – pp. 1-5. The AWC details Esteva's grave offenses during a 16-year period, capped by his and his attorney's signatures and consent to the charges and lifetime banishment. *Id.* Esteva concedes in the AWC that he also violated FINRA rules by failing to cooperate with the investigation, further compounding his offenses. *Id.* Hence, even if UBS had not fired him, Esteva was prohibited from servicing UBS clients or any other clients in the securities industry, dashing the prospects for repayment of the loan.

Because the conduct for which Esteva was barred from the industry consisted of his own malfeasance that began previously at Merrill Lynch, and is conduct that Esteva expressly acknowledged in the FINRA AWC, Esteva did not at the time and cannot now disclaim knowledge that he had been (for many years) illegally falsifying account statements and making unauthorized transfers of client funds at

the time that he executed the Promissory Notes with UBS.[2]  Doc 47-3 – pp. 1-5.
Nevertheless, he concealed this crucial information from UBS while negotiating the
terms of his employment (including the Promissory Notes) with UBS.  Moreover,
this illicit conduct continued during his brief tenure at UBS, contrary to UBS policy,
applicable law and FINRA regulations.  To date, Esteva has not repaid any of the
funds owed to UBS pursuant to the Promissory Notes.  Doc 47-2 – p. 2, ¶4.
Following Esteva's termination, UBS restricted and froze the House Account, as
expressly permitted by the CRA.  Doc 47-2 – p. 2, ¶6.

On July 28, 2017, Otero filed for arbitration against UBS, seeking to lift the
restriction on the House Account on the basis that she was not a signatory to the
Promissory Notes, notwithstanding that she never personally provided any
consideration to UBS for the funds loaned pursuant to the Promissory Notes, and
even though her husband's own consideration failed due to his disqualification from
the industry.  Doc 47-3 - Pg 1-5.  On August 7, 2017, after Esteva refused to repay
the outstanding loan balance of $2,034,662.28 owed pursuant to the Promissory
Notes, UBS filed an arbitration against Esteva to recoup those funds. Both of these
cases were pending before FINRA at the time Esteva filed his bankruptcy petition.
Doc 47 - Pg 2, 4.

---

[2] As noted above, Esteva consented to the findings about his conduct
and his expulsion from the industry, undoubtedly in an effort to
limit his exposure to criminal prosecution.

## B. PROCEDURAL HISTORY

On May 31, 2018, Esteva filed a petition under Chapter 7 of the Bankruptcy Code, and FINRA stayed both arbitrations.  Doc 47 - Pg 4.  He subsequently moved to convert the case to Chapter 11.  Doc 9 – Pg 10.  In his bankruptcy filing, Esteva claimed the House Account as exempt under state law because it is owned as a tenancy-by-the-entirety.  In Esteva's schedules, he lists unsecured claims totaling $2,018,318.00, of which UBS is alleged to hold an unsecured claim for $1,950,000.  Doc 47 - Pg 4.  On March 26, 2019, UBS filed a proof of secured claim (Claim No. 5) in the amount of $2,034,662.28.  *Id.*  As of March 5, 2020, the House Account was valued at $2,098,797.44.  Doc 47-2 - Pg 2.

The adversary proceeding was filed by Esteva and his wife, who are also counterclaim-defendants.  Doc 1.  The Complaint is premised on the untenable arguments that Esteva was entitled to divert to his wife the proceeds of loans made solely to him by his employer under specified conditions, that his wife is not bound by the express security interest and the joint and several liability to which she agreed in these very funds, and that – absurdly -- UBS owes him compensation in connection with revenues generated by clients that he is barred by regulators from receiving.

Without any meaningful discovery on either side, Appellees moved for summary judgment on Counts 1 through 3 of their Complaint and partial summary

7

judgment on Count 4. Doc 28 – Pg 1. They also sought corresponding dismissal of Defendants/Appellants' four counterclaims, seeking, respectively, a declaration of UBS's security interest, avoidance of fraudulent transfers, contractual setoff, and common law setoff. *Id.*

Eschewing a trial or any form of evidentiary hearing, the Bankruptcy Court granted Appellees' motion. *See* Docs 64, 65, and 66. In doing so, the court essentially determined that Esteva, even though he knowingly committed concealed illegalities that would inevitably disqualify him from working at UBS or anywhere else in his field, could properly transfer the $2 million in proceeds of a loan he obtained from UBS to a joint account with his wife and thereby insulate those proceeds from repayment under the terms of Appellees' agreements and the promissory notes incorporated in the parties' CRA. *Id.*

On September 29, 2021, the District Court affirmed the partial final judgment of the Bankruptcy Court. Doc 101 – Pg 1. The District Court's opinion adopted the Bankruptcy Court's factual findings as not "clearly erroneous" and cursorily held that its "legal conclusions were supported by the law." Doc 101 - Pg 7. Although the District Court stated that it "conducted a *de novo* review of the Bankruptcy Court's legal analysis," *Id.,* it did not specifically address the issues raised before both the Bankruptcy Court and the District Court regarding the comprehensive language in the CRA or the resulting free pass that was given to Esteva for his illegal

behavior. The District Court's opinion was silent on the Bankruptcy Court's conclusions (a) that Esteva's wife was not bound by the security interest created by the CRA even though she signed the document and "you" was defined to include both spouses, and (b) that, as a matter of law without a hearing, Esteva could not have known or foreseen that his illegal activities could have rendered him unable to repay the UBS loans because he had gotten away with his misappropriation of client funds for so long that he reasonably expected he would never get caught.

## C. RULINGS PRESENTED FOR REVIEW

UBS now seeks review of an Order entered July 17, 2020, and its affirmance via the District Court's September 29, 2021, Order, which granted Appellees summary judgment on every issue except for Esteva's preposterous claim that UBS was unjustly enriched by retaining his clients after he was permanently prohibited by FINRA from servicing them or accepting any related compensation. The rulings presented for review under the Order are:

- UBS has no security interest in the House Account.

- Appellees engaged in no fraudulent transfers.

- UBS is not entitled to a setoff.

- Appellees were not unjustly enriched.

9

## SUMMARY OF THE ARGUMENT

Esteva's liability to UBS on the Promissory Notes is essentially undisputed. Appellees' efforts to retain the loan proceeds of more than $2 million are based upon their position that the deposit of the proceeds into a tenancy-by-the-entireties account shields the account from creditors of either spouse. The law is clear, however, that such an account is not immune from a creditor such as UBS to whom both accountholders have granted a security interest.

In this case, both Appellees signed the CRA. The painstaking language of the CRA grants a lien on behalf of both accountholders to secure any debt owed by either of them to UBS under the CRA or otherwise, explicitly including any promissory notes. The lower courts erred in exculpating Otero on the ground that Otero had no other agreement with UBS, for the plain reason that the CRA itself created the joint and several liability and security interest by its express terms.

The court also improperly granted summary judgment on Defendants/Appellants' alternative claims that the transfer to the wife of an interest in the loan proceeds without consideration was a fraudulent transfer under Article 726 of the Florida Statutes. UBS' counterclaims allege that because Esteva, at the time he signed his agreements and took the loan from UBS, was engaged in illegal conduct that he knew, if exposed, would cost him his livelihood, he either intended to delay, hinder, or defraud UBS as a creditor, or had reason to believe that he would

be unable to repay the debt.   The court's reasoning – that because he had gotten away with his transgressions for so long, he was justified in believing that he would never be caught – was unprecedented, unreasonable, failed to accord all inferences to UBS as the non-movant and resolved an issue of fact reserved for trial.  In fact, his filing for bankruptcy protection so soon after his illegal conduct was exposed bespeaks his awareness and the objective likelihood of insolvency that rendered the transfer to the joint account fraudulent.

The court alternatively held that because the assets in the account consisted of marital income that would be subject to division in case of a hypothetical divorce, there was no fraudulent transfer without consideration from the husband, who earned the income, to the wife.  In equitable distribution states such as Florida and New York, however, it is well-settled law that marital property or income does not come into play unless and until there is a divorce action.  Even if the equitable distribution law were as the judge incorrectly found, that same law would make repayment of the UBS loan a marital debt for which the spouses would share responsibility.

A bankruptcy court is a court of equity.  The result below effectively condoned illegal actions on the part of Esteva, with the complicity of his spouse.

## ARGUMENT

## I

## THE AWARD OF SUMMARY JUDGMENT BELOW WAS CONTRARY TO THE EXPRESS WRITTEN PROVISIONS OF THE PARTIES' AGREEMENTS

Appellees were not entitled to summary judgment on Counts 1 and 2 of the Complaint because UBS has a perfected security interest in the House Account.[3] Both sides appear to agree that UBS would be entitled to the funds in the joint account if it can establish a security interest in the House Account to which both appellees assented. A perfected security interest enables a creditor to reach an asset that may otherwise be exempt. *In re Brooks*, 2013 Bankr. LEXIS 5571 (Bankr. N.D. Fla. 2013). In addition, tenancy-by-the-entireties property is exempt from the claims of a couple's individual creditors, but not the claims of their joint creditors, pursuant to Florida law. *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135, 1139 (11th Cir. 1999).

---

[3] Count 1 seeks a declaratory judgment that the House Account is exempt from creditors and Count 2 seeks to determine the issue of the UBS lien. Because Count 1 is essentially dependent on the results of the issues raised in the remaining Counts, we do not address it separately, but instead oppose it for the same reasons that summary judgment fails on the other Counts. Similarly, partial summary judgment was granted on Count 4 to the extent of a declaration that UBS's claim is unsecured. If reversal is granted on Counts 2 and 3, reversal on Count 4 should follow as a matter of course.

There can also be no dispute that a court's interpretation of contract documents is a matter of law. *City of Orlando v. H.L. Coble Constr. Co.,* 282 So. 2d 25, 26 (Fla. 4th DCA 1973) ("[t]he construction of a written contract is a matter of law to be determined by the court"); *Palm Beach Pain Mgmt., Inc. v. Carroll*, 7 So. 3d 1144, 1145-46 (Fla. 4th DCA 2009) ("[i]f a contract's terms are clear and unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls").[4]

The linchpin of the erroneous holding below was its determination as a matter of law that the meticulously drafted CRA signed by both appellees essentially did not mean what it literally said. Of course, the CRA, like any other contract, must be enforced according to its terms. *See*, *e.g.*, *Robbinson v. Central Properties, Inc.*, 468 So.2d 986, 987 (Fla. 1985); *In re C.D. Jones & Co.*, 2016 Bankr. LEXIS 3127 (Bankr. N.D. Fla. 2016).

The literal terms of the CRA leave no doubt that UBS has a perfected security interest. Moreover, since appellees appear to concede that the CRA grants UBS a

---

[4] Moreover, if the wording were ambiguous and the parties presented different reasonable interpretations then "the issue of proper interpretation can become one of fact, thus precluding summary judgment." *Bunnell Med. Clinic, P.A. v. Barrera*, 419 So.2d 681, 683 (Fla. 5th DCA 1982). Thus, the Bankruptcy Court's holding can survive only if the contract language clearly and unambiguously denies UBS a security interest, a matter which this Court addresses *de novo*.

security interest in Esteva's interest in the House Account, the only material issue is whether the lien encompasses Otero's one-half interest in the House Account and its assets, since, otherwise, there would be no exemption. That said, the result here is the same whether the owner is Esteva, Otero, or the two parties jointly.

The question of whether UBS's security interest in the House Account attaches and is perfected is readily resolved through an examination and analysis of the CRA and several UCC provisions that have been adopted by New York (the state whose law applies under the CRA). Doc 9-2 – p. 12 (*Security Interest*), pp. 14-15 (*Applicable Law*).

The CRA, signed by both appellees, states:

> **As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between you and any UBS Entity, including but not limited to any loans or promissory notes, you hereby grant to each UBS Entity a security interest in and lien on any and all Property held or carried by any UBS Entity for you or on your behalf in or credited to any UBS Account(s) . . .**
> **All such Property will be subject to such security interest as collateral for the discharge of your obligations to any UBS Entity, wherever or however arising and without regard to whether or not we made loans with respect to that Property.** . . Each UBS Entity shall act as agent for and on behalf of each UBS Entity for purposes of perfecting, maintaining and enforcing the security interests granted hereunder or by operation of law.

Doc 9-2 – p. 12 (*Security Interest*)(emphasis added).

14

This question, however, devolved into an unnecessary and improbable dispute of whether "you" refers to one appellee for some purposes and both appellees for others.  Since both parties signed the CRA, the analysis should have ended at the signature lines.  "The most common assent to a contract is well known: '[g]enerally 'one who signs a contract which she has had an opportunity to read and understand is bound by its provisions.'"  *Morioka v. Nissin Travel Servs. (U.S.A.)*, 2018 U.S. Dist. LEXIS 219247, *8-9 (E.D. Mich. 2018) (citations omitted).  A party who signs an agreement is bound by all of its terms and is presumed to have received consideration.  *See Kinko's, Inc. v. Payne*, 901 So. 2d 354 (Fla. 2d DCA 2005); *Garcia v. GMRI, Inc.*, 2013 U.S. Dist. LEXIS 189381 (C.D. Cal. 2013).  The lower courts should have gone no further.

Even more so, "You," "Your," and "Yours" are specifically defined by the CRA as "you as a client of UBS."  Doc 9-2 – p. 2.  Both appellees signed the CRA.  Doc 9-2 – pp. 22-24.  Thus, under a plain reading of the contract, both of them granted UBS a security interest in the House Account by affixing their signatures.

The Bankruptcy Court, however, adopted appellees' strained argument that "you" as defined in the agreement was not "intended by UBSFS, its drafter, to be construed in the plural to include Esteva [*sic*]."  Consequently, the determination boiled down to whether "you" or "your" referred to a party in the singular, or to both parties, each of whom signed the document.  The bankruptcy judge, creating an

15

artificial bifurcation in the word "you" for some purposes, but not for others, found that:

> It is clear when the section is read in its entirety that the 'you' and 'yours' refers to debts that either accountholder has to UBS under the CRA or separate agreement, but not that either accountholder then automatically becomes liable for the other's debts under a separate agreement[.]  Doc 64 – p. 12.[5]

At the outset, there is nothing in that section which would suggest that it was limited to one accountholder, and certainly nothing that would make such an interpretation "clear."  Both Esteva and Otero signed that same document containing the "you" language and definition on page 19 of the CRA (Doc 9-2 – p. 2); and "you" refers in plain English both to singular and plural.  The word "you" is the second-person personal pronoun, both singular and plural.  *See, e.g.,* Webster's Ninth New Collegiate Dictionary (Merriam-Webster 1991) at 1369 (defining "you" as "the pronoun of the second person singular or plural").  "One looks to the dictionary for the plain and ordinary meaning of words."  *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1024 (11th Cir. 2014), quoting *Beans v. Chohonis*, 740 So.2d 65, 67 (Fla. 3d DCA 1999); *Bianco v Bianco*, 36 A.D.3d 490, 491, 830 N.Y.S.2d 21 (1st Dep't 2007) (reference to dictionary is common to determine "plain meaning").

---

[5] All page references to the transcript found at Doc 64 are references to the page of the transcript as affixed by the court reporter.

This Court's recent unpublished opinion in *Fisher v. PNC Bank, N.A.*, No. 21-13266 (11th Cir. Jun. 7, 2022), in the context of a similar joint account agreement, flatly rejects this construction of the word "you" and essentially mandates a reversal of the orders below.

In *Fisher*, the plaintiff had opened a joint brokerage account with her mother, which contained an arbitration clause. The plaintiff signed the Agreement with her name as the "Joint Ac-count Owner/Custodian" and her mother's name in the "Account Owner" section. Plaintiff argued she was not bound by the arbitration clause because (1) she signed the agreement not in her personal capacity, but as her mother's guardian, and (2) there was no arbitrable issue between her and PNC Bank because her claims did not arise from the agreement. This parallels Otero's argument herein that she signed the CRA for one purpose, but not for another.

As in the present case, the outcome in *Fisher* turned on whether the word "you" obligated plaintiff to all of the terms of the joint account agreement, even if she stood in different shoes than her mother. This Court held, as we urge herein, that "you" refers to each "person who applied for the account and signed the application":

> Fisher has not alleged that her signature was nonvoluntary or otherwise fraudulently obtained. Even though Fisher opened the account for her mother, **we interpret the word 'you' in the clause to refer to Fisher as the person who applied for the account and signed the**

**application**. Accordingly, Fisher is bound by the arbitration clause. [Emphasis added.]

Slip op. at 6. This Court went on to hold that only an explicit carve-out of an obligation as applied to plaintiff could absolve her, as a signatory, of all covenants of the account agreement. No such carve-out exists in the CRA at issue in this matter.

In the present case, the CRA explicitly renders Otero and Esteva jointly and severally responsible for all obligations covered by the account, expressly stating that their account collateralizes any promissory notes. *Fisher* disposes of appellees' reliance upon a contorted construction of the word "you."

*Fisher* also holds that a litigant cannot make claims under an account agreement – as Otero also does here[6] – while at the same time disclaiming her own obligations under the same agreement. Slip op. at 7 (citing *Allied Prof'ls Ins. Co. v. Fitzpatrick*, 169 So.3d 138, 142 [Fla. Dist. Ct. App. 2015] ["[u]nder Florida law, a non-signatory cannot seek benefits under an agreement while "simultaneously attempting to avoid the burden of the policy's arbitration provision"]).

Moreover, despite the mandate under New York contract law that the court vivify and harmonize **all** provisions in an agreement, *see* n. 7, *infra,* the bankruptcy judge compartmentalized three key provisions of the CRA which, if read together,

---

[6] For example, appellees' Complaint seeks the turnover of funds in the House Account.

18

would overwhelmingly support the lien on the account urged by UBS: (1) that "as security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this **or any other agreement between you and any UBS Entity**, including but not limited to any loans or promissory notes, you hereby grant to each UBS Entity a security interest in and lien on any and all Property held or carried by any UBS Entity for you or on your behalf in or credited to any UBS Account(s)"; (2) that "**the account holders are jointly and severally liable for all obligations with respect to the Account**"; and (3) that "[b]y maintaining your Accounts at UBS, you agree to these terms and conditions **and the other agreements** and disclosures we refer to here" – which by definition would include "any loans or promissory notes" as recited above (emphasis added). Rather than review these clauses collectively and honor the law's mandate that they all be given effect, the Bankruptcy Court instead accepted the notion that, because Otero did not sign the notes or other agreements incorporated by reference, there was no agreement by Otero for the lien to collateralize. The fallacy in this reasoning is the obvious point that the CRA itself served to create the very agreement between Otero and UBS that the Bankruptcy Court somehow found absent.[7]

---

[7] "[W]hen documents are incorporated by reference into a document, they are to be read as though they are restated in the contract." *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1016 (6th Cir. 2003).

The bankruptcy judge's own words reveal that she misapprehended the scope of UBS's position. She viewed UBS as attempting to make Otero "liable for the other's debts under a separate agreement." But UBS does not go that far. We do not assert that Otero is now liable on the Promissory Notes themselves. Rather, it suffices that she granted UBS a lien on the House Account to secure the obligation under the Promissory Notes. The arrangement among UBS, Esteva and Otero is no different than the common and plainly enforceable situation in which only one owner of jointly owned realty signs a promissory note, but both owners sign the mortgage that collateralizes the note.[8] *See, e.g., Smith v. IndyMac Fed. Bank, F.S.B. (In re Winter),* 2010 Bankr. LEXIS 704 (Bankr. D.N.H. 2010)("the Mortgage is enforceable, but the Debtor is not obligated under the terms of the promissory note").

Making the Bankruptcy Court's strained interpretation even more dubious, the court essentially found that UBS had no intent to extend the security interest in the House Account to Otero, inexplicably casting doubt that "UBS really believed that Ms. Otero's signing of the CRA created a security interest in the house account[.]"

---

[8] The court distinguished this argument by stating that a mortgage "very clearly describes the collateral and the lien that it secures, and the consideration given in support of the mortgage." This distinction lacks substance or any supporting authority. In fact, the signature page of the CRA specifically sets forth the account number, the CRA refers to **any** agreement with UBS, including promissory notes, and Otero has never denied being aware of the source of funds that constitute the corpus of the account. Just the opposite, Otero pleads together with Esteva in the Adversary Complaint, which acknowledges and attaches the notes.

Doc 64 – Pg 13.  A review of the CRA in its entirety, however, leaves not the slightest doubt that the signers fully intended to subject the House Account to recovery of the amounts due to UBS under the promissory notes.[9] *Brad H. v. City of New York*, 17 N.Y.3d 180, 185-86, 951 N.E.2d 743, 746, 928 N.Y.S.2d 221, 224 (2011)("language should not be read in isolation because the contract must be considered as a whole").  In *Fernandez v. Price*, 63 A.D.3d 672, 676, 880 N.Y.S.2d 169, 173 (2d Dep't 2009), the court held that "[w]hen interpreting a contract, the construction arrived at should give fair meaning to all of the language employed by the parties, to reach a practical interpretation of the parties' expressions so that their

---

[9]  The court also questioned, without citing any authority, why UBS would rely on the clause incorporating liability under other agreements with UBS since the CRA already contained a joint and several liability clause.  Redundancy, however, does not serve to erase a clause.  Indeed, under New York law, every provision of a contract is to be given meaning.  New York's courts "have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect." *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589, 671 N.E.2d 534, 536, 648 N.Y.S.2d 422, 424 (1996) (citations omitted). "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 133 N.E.2d 688, 690, 150 N.Y.S.2d 171, 174 (1956). The Bankruptcy Court's holding flies in the face of New York's "principle that a contract which confers certain rights or benefits in one clause will not be construed in other provisions completely to undermine those rights or benefits." *Ronnen*, 88 N.Y.2d at 590, 671 N.E.2d at 537, 648 N.Y.S.2d at 425 (citations omitted).  If anything, the two portions of the CRA, read together, reinforce the agreement's intention to employ the House Account as security for either spouse's obligations to UBS.

reasonable expectations will be realized." Here, it can hardly be reasonable to construe UBS's expectations as allowing an imminently bankrupt Esteva to transfer the proceeds of his secured loan from UBS into an account jointly with his wife with Esteva bound to the lien, but not his wife.

To make matters even worse, after earlier finding it "clear" that the lien was not intended to cover Otero, the Bankruptcy Court found "at best the CRA is ambiguous. Its interests are not 'meticulously entrenched,' as UBS argues, and, as Mr. Esteva's counsel pointed out at the hearing, any ambiguity in a contract is construed against the drafter. 67 Wall Street Company versus Franklin National Bank, 37 N.Y.2d, 245-249, 1975." Doc 64 – Pg 13.

This finding was error for at least two reasons. First, under New York law, construction against the drafter is "a rule of construction that should be employed only as a last resort." *Fernandez v. Price*, 63 A.D.3d at 676, 880 N.Y.S.2d at 173. Here, even if there were an ambiguity, the judge should have followed New York law and considered the other abundant evidence reflecting the intent of the parties.

Second, if there were indeed an ambiguity in the contract, the court should not have granted summary judgment. Instead, a trial should have been scheduled to adjudicate the intent of the parties. *See St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815 (11th Cir. 1999); *Berkeley Research Group, LLC v. FTI Consulting, Inc.*, 157 A.D.3d 486, 489, 69 N.Y.S.3d 26 (1st Dep't 2018) (where a

22

provision is "subject to more than one or conflicting reasonable interpretations," New York law "require[es] a trial on the parties' intent").

No pause should be given on account of the court's finding that one or more of the provisions on which UBS relies is "boilerplate" that appears in all of its client agreements.  Under New York law, a clause cannot be ignored simply because it is "boilerplate." *Dreisinger v. Teglasi*, 130 A.D.3d 524, 13 N.Y.S.3d 432 (1st Dep't 2015).  In fact, in this case, at the time Esteva and wife signed the CRA, he was a UBS employee servicing customer accounts subject to the very same agreement.

The construction urged by appellees here is disingenuous.  They contend that Otero does not owe UBS a debt, but simultaneously claim that she is a one-half owner of the funds that were **loaned** to Esteva as part of his short-lived employment with UBS.  If appellees hold to such an assertion, then they would necessarily be admitting to a fraudulent transfer in which Esteva routed funds loaned to him alone to Otero without receiving reasonably equivalent value, with the intent to shield the borrowed funds from UBS pursuant to an inapt claim of tenancy-by-the-entirety. *See* Fla. Stat. §§ 726.105, 726.106 (2021).

Appellees cannot have their cake and eat it too.  If Otero relies entirely upon the doctrine of tenancy-by-the-entirety, then she must inherently acknowledge that her interest in the House Account was a fraudulent transfer because she provided no

consideration.  In such event, the funds would revert to the bankruptcy estate[10] and would therefore be recoverable by UBS pursuant to its security interest or right to setoff or, in a worst case, as the debtor's largest creditor.

If, on the other hand, Otero is able to claim an ownership interest in the House Account, then her interest is unassailably subject to the CRA she signed with UBS. In that event, the CRA, like any other contract, must be enforced according to its terms.  *See*, *e.g.*, *Robbinson v. Central Properties, Inc*., 468 So.2d at 987; *In re C.D. Jones & Co.*, 2016 Bankr. LEXIS 3127.

Accordingly, Otero cannot be heard to say on the one hand that her husband's ill-begotten loan proceeds are immune from contractual recoupment by the lender because the parties are married, while on the other hand she should be excused from complying with an express obligation that she assumed with him jointly by contract.

---

[10]  Indeed, the House Account might not be properly treatable as ordinary property of the estate as it represents the product of loans tendered by UBS under false and fraudulent pretenses.  *See In re Reynolds*, 151 B.R. 974 (Bankr. S.D. Fla. 1993) ("bare record title for the convenience of the real owner" does not render a disputed asset property of the estate for fraudulent conveyance purposes); *see also Moyer v. Geer (In re Geer)*, 522 B.R. 365 (Bankr. N.D. Ga. 2014) (unpaid pre-petition bonus converted to forgivable loan is not property of the estate).  Under the circumstances of this case, the funds are arguably the property of UBS under its right of setoff.  The Court need not necessarily reach this proposition in light of the strength of UBS' other arguments.

She can no more repudiate the security interest granted jointly by her husband and her than she could avoid foreclosure of a mortgage on jointly owned real estate.

The Bankruptcy Court, having granted summary judgment by rejecting the existence of the lien, did not reach the question of perfection. We will nevertheless note briefly that establishing perfection is not a difficult task. All that is required is a form of control.

Pursuant to N.Y. UCC § 9-203, a security interest attaches when it is enforceable against the debtor. *See* N.Y. UCC § 9-203 (Consol. 2019). A security interest is enforceable against the debtor in favor of the secured party if (1) value has been given; (2) the debtor has right in the collateral; and (3) the debtor has authenticated a security agreement that provides a description of the collateral or the collateral is investment property for which the secured party has control pursuant to N.Y. UCC § 9-106 pursuant to the debtor's security agreement. *See id.* Based on the language in the CRA, it is clear that the debtors[11] (i.e., appellees) have authenticated (i.e., signed) the CRA, which provides a description of the collateral (i.e., the property held in the House Account).

Pursuant to N.Y. UCC § 9-310, a security interest can be perfected without a filing. *See* N.Y. UCC § 9-310 (Consol. 2019). Pursuant to N.Y. UCC § 9-310(b)(8),

---

[11] "Debtors" is used in this paragraph in its generic sense, as only Esteva has sought bankruptcy protection.

the filing of a financing statement is not necessary to perfect a security interest in investment property, which is perfected by control under N.Y. UCC § 9-314. *See id.*

Pursuant to N.Y. UCC § 9-314(a), a security interest in investment property may be perfected by control of the collateral under N.Y. UCC § 9-106.[12] *See* N.Y. UCC § 9-314 (Consol. 2019).

Pursuant to N.Y. UCC § 9-106(a), a person has control as provided in N.Y. UCC § 8-106.[13] *See* N.Y. UCC § 9-106 (Consol. 2019).

Pursuant to N.Y. UCC § 8-106(e), UBS qualifies as having control. N.Y. UCC § 8-106(e) states that if an interest in a securities entitlement (i.e., the securities held in the account) is granted by the entitlement holder (i.e., the account owners – Appellees) to the entitlement holder's own securities intermediary (i.e., UBS), the securities intermediary has control. *See* N.Y. UCC § 8-106 (Consol. 2019). Control is all that is required for perfection of a security interest in investment property. *See id.* By signing the CRA, appellees granted UBS control of the House Account. The

---

[12] Moreover, pursuant to N.Y. UCC § 9-106(c), a security interest in investment property is perfected by control under Section 9-106 from the time the secured party obtains control and remains perfected by control until the secured party does not have control. Thus, UBS continues to have a perfected security interest because it has control of the House Account.

[13] Additionally, a secured party having control of all security entitlements in a securities account has control over the securities account.

CRA grants UBS a security interest for any debts incurred by either of the House Account owners to UBS.

## II

## COUNT 3, SEEKING TURNOVER,
## FAILS AS A MATTER OF COURSE

Count 3 of appellees' Complaint is a claim brought solely by Esteva against UBS Financial Services Inc., for turnover of the House Account pursuant to Section 542 of the Bankruptcy Code. *See* 11 U.S.C. § 542. It is Esteva's burden to establish by clear and convincing evidence that he has a right to turnover of the House Account. *See Maggio v. Zeitz*, 333 U.S. 56, 68 (1948); *Evans v. Robbins*, 897 F.2d 966, 968 (8th Cir. 1990); *Lawrence v. Chapter 7 Trustee (In re Lawrence)*, 251 B.R. 630, 640 (S.D. Fla. 2000). The purpose of Section 542 is to recover property, not to recover **disputed** property in which the debtor may have an interest. *Olympia Holdings Corp. v. Nat. City Bank of Columbus (In re Olympia Holding Corp.)*, 221 B.R. 995, 998 (Bankr. M.D. Fla. 1998) (citations omitted). Esteva succeeds to no greater rights than he had on the day the petition for bankruptcy was filed. *Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997). "[W]here a debtor . . . does not have a right to possess or use property at the commencement of the case, the right generally cannot be acquired through a turnover action under § 542(a)." *Rhiel v. OhioHealth Corp. (In re Hunter)*, 380 B.R.

753, 780 (Bankr. S.D. Ohio 2008) (citations omitted) (internal quotation marks omitted); *see also Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.)*, 188 B.R. 287, 295 (M.D. Fla. 1994).

Additionally, a creditor with a valid right of setoff need not turn over the property in question. *See In re Patterson*, 967 F.2d at 509. Appellants here enjoy such a right under 11 U.S.C. § 553.

Esteva has no right to turnover of the House Account. As explained in Point I above, UBS is a secured creditor with a perfected interest in the House Account. Esteva does not succeed to any greater rights in property simply by filing for bankruptcy protection. *See In re Olympia Holding Corp.*, 221 B.R. at 998; *In re Graham Square, Inc.*, 126 F.3d at 831. The House Account is disputed property, in which, at best, Esteva **may** have an interest.

### III

### THE DEPOSIT OF THE UBS LOAN PROCEEDS INTO THE JOINT ACCOUNT WAS A FRAUDULENT TRANSFER

In opposing summary judgment, UBS has urged as an alternative ground that the deposit of the UBS loan proceeds into a joint account with his wife constituted a

fraudulent transfer.[14]  UBS seeks relief under the substantially identical provisions of 11 U.S.C. § 548(a) or Fla. Stat. § 726.105, which nullify a transfer made either with actual intent to hinder, delay or defraud creditors or where the transferor did not receive reasonably equivalent value under certain enumerated circumstances.[15] As this Court has held:

> The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate.

*In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990).

### A. Liability Under Section 726.105.

Section 726.105, in pertinent part,    renders the following transfers fraudulent as to present and future creditors:

> (1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

---

[14] Although the cause of action normally belongs to the debtor or the trustee under Section 548, the Bankruptcy Court allowed UBS to pursue the claim, on consent of the debtor.  Doc 64 – Pg 4.

[15] *See In re Stewart*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001). "The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law." *Kapila v. Suntrust Mortg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).

(b)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1.   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2.   Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(2)   In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a)   The transfer or obligation was to an insider.

(b)   The debtor retained possession or control of the property transferred after the transfer.

\*       \*       \*

(d)   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e)   The transfer was of substantially all the debtor's assets.

\*       \*       \*

(h)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j)   The transfer occurred shortly before or shortly after a substantial debt was incurred.

\*       \*       \*

30

The recited factors are commonly known as "badges of fraud." While one specific badge of fraud may be insufficient to establish fraudulent intent, "several of them together may afford a basis to infer fraud." *In re PSI Indus., Inc.*, 306 B.R. 377, 387 (Bankr. S.D. Fla. 2003)(citing *In re World Vision Entm't, Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002)). Also, "[t]he existence of badges of fraud create a prima facie case and raise a rebuttable presumption that the transaction is void." *Nationsbank, N.A. v. Coastal Utils., Inc*., 814 So.2d 1227, 1230 (Fla. 4th DCA 2002) (citation omitted). The *Nationsbank* decision also instructs that summary judgment is improper where the transferor's intent is in question. *Id.* at 1231 (subjecting Section 726.105 cases to the rule that "in fraud cases, summary judgment is available only in extraordinary circumstances"). In addition, Section 726.106(1) states unequivocally that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[16]

---

[16] UBS has asserted counterclaims involving both constructive fraud and actual fraud, contending under the statute that even if *arguendo* Esteva made no affirmative misrepresentation to obtain the loans, he at least engaged in the transactions with an intent to hinder or delay UBS's remedies as a creditor. In her oral

The best evidence of Esteva's insolvency is the conceded fact that, quickly after Esteva's wrongdoing was exposed, with a concomitant loss of his livelihood, he filed for bankruptcy protection. By signing his Chapter 7 petition, he necessarily admitted under penalty of perjury at least one of the tests for insolvency. Indeed, in and of itself, a "bankruptcy filing is rather good evidence of his insolvency at the time of the transfer." *Reid v. Wolf (In re Wolf)*, 595 B.R. 735, 777 (Bankr. N.D. Ill. 2018); *see also United States v. Key,* 837 F. App'x 348, 353 (6th Cir. 2020) ("[f]iling a bankruptcy petition is generally evidence of insolvency"); *In re Porter*, 50 B.R. 510, 517 (Bankr. E.D. Va. 1985).

Furthermore, "the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *Kim v. Yoo*, 311 F.Supp.3d 598, 610-11 (S.D.N.Y. 2018), *aff'd*, 776 Fed. Appx. 16 (2d Cir. 2019) (quoting *United States v. Watts*, 786 F.3d 152, 164 (2d Cir. 2015). (citations omitted)); *Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 U.S. Dist. LEXIS 12576, at *150 (S.D.N.Y. Aug. 30, 2000) ("The effect of this presumption is to impose the burden of coming forward with proof of

---

decision, the bankruptcy judge stated that "UBS conceded that there was no basis for me to find that the house account was created with actual fraudulent intent." Doc 64 - Pg 20. UBS did not make such a sweeping concession. Regardless, it is clear that it was the **use** of the account, not necessarily its creation, that triggers the statute here.

solvency on those defending the transfers"); *see also United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 577 (M.D. Pa. 1983), *affd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005 (1987); *United States v. West*, 299 F. Supp. 661, 665 (D. Del. 1969); *Ossen v. Bernatovich (In re National Safe N.E., Inc.)*, 76 B.R. 896, 902 (Bankr. D. Conn. 1987); *Reigle v. Leinheiser (In re Leinheiser)*, 51 B.R. 164, 166 (Bankr. E.D. Pa. 1985); *Garrett v. Faulkner (In re Royal Crown Bottlers, Inc.)*, 23 B.R. 28, 31 (Bankr. N.D. Ala. 1982).

The Bankruptcy Court bypassed an analysis of the relevant itemized factors. Suffice it to say, the facts here reflect many of the specific "badges of fraud" to which the courts look under the statute: a transfer to a spouse, who is considered an insider; the proximity of the House Account's creation to the receipt of the UBS loan; Esteva's knowing and ongoing violations of the securities laws that threatened both his professional license and the emergence of claims against him; and his inability to satisfy his creditors if he were caught.

And appellees themselves have never disputed that Otero paid no consideration for the transfer. Instead, they argued below that "under the unique facts" of this case, "there is no reasonable inference to support the deposits left Esteva undercapitalized or with an inability to pay his debts as they came due" and that the parties' marital status constitutes sufficient consideration. Doc 28 – Pg 15.

At the outset, Esteva is ill-positioned to make his solvency argument given his own conduct in filing a bankruptcy petition not long after the funds were transferred to Otero and the loan proceeds had become repayable due to his termination.  In any event, these are, at best from appellees' perspective, questions of fact that are not determinable by summary judgment.  Summary judgment is not to be granted in fraud cases generally except in unusual circumstances, *Automobile Sales, Inc. v. Federated Mut. Implement & Hardware Ins. Co.*, 256 So.2d 386 (Fla. 3d DCA 1972); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 140 (Bankr. M.D. Fla. 2013), or, in fraudulent transfer cases, "extraordinary circumstances." *Nationsbank,* 814 So.2d at 1231.

Although the Bankruptcy Court rejected the principal defenses raised by Esteva – in particular, his contention that the deposit into the joint account was not a "transfer" – the court nevertheless accepted two bases for its dismissal of the fraudulent transfer claims:  (i) that Esteva could not, as a result of the transfer, reasonably have believed that he would incur debts beyond his ability to pay as they became due because he had successfully gotten away with his illegal behavior for so long, and (ii) that the transfers were not voidable for lack of consideration because the loan proceeds were a form of "marital property" under divorce law.   Doc 64 – Pg 21-28.  Both of those rulings were improper as a matter of law.

### i.    Esteva Knew or Had Reason to Believe That His Ongoing Illegal Activities Would Eventually Cost Him His Career and His Resultant Ability to Repay the Loan and Other Debts

Incredibly, Esteva asserted that there is "no reasonable inference possible" that the deposits into the House Account would leave him without an ability to pay his debts when they came due.  Doc 28 – Pg 15.  At the time that he signed his agreements and obtained the loan from UBS, he well knew that he had committed at Merrill Lynch and was continuing to commit at UBS the illegal conduct that would almost certainly cost him his securities licenses and consequently his ability to work in the high-income generating securities field.  At a minimum, these are questions of fact and inferences of fraud that precluded summary judgment in appellees' favor. We submit, however, that UBS is entitled to a determination in its favor now.

Surprisingly, even though the lower court professed not to condone Esteva's illegal activities, its decision fully embraced his absurd argument that there was no basis on which to infer any belief on his part that his 16-year pattern of egregious misconduct (misconduct that he never challenged but instead expressly acknowledged and waived all defenses to) would leave him without a job and the concomitant income to repay the UBS loans.  To support her concurrence, the bankruptcy judge offered a stunning finding, **without even a supporting averment by Esteva himself**, that because his misdeeds had escaped discovery for so long, he was somehow justified in assuming that he would never be caught:

Contrary to UBS's interpretation of these facts, based on UBS's own argument that Mr. Esteva had been doing this illegal trading for years with impunity, **a more likely interpretation is that in Mr. Esteva's mind, he was never going to get caught**. So there's no dispute on this issue that would warrant denial of summary judgment. Doc 64 – Pg 27-28. [Emphasis added.]

This finding should be reversed, and the UBS counterclaims reinstated, based on two cornerstones of Rule 56 jurisprudence as well as public policy. First of all, the court erred in granting summary judgment on "a more likely" of two interpretations. The Court's role is issue finding, not issue determination. *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491 (D.N.H. 1996); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court's function at the summary judgment stage is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In addition, every inference must be granted to UBS as the non-movant. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). Indeed, Esteva proffered no meaningful reason for the transfer of his loan proceeds into the House Account shared with his wife. *See Patton v. Cole (In re Cole)*, 2020 Bankr. LEXIS 3425, at *14 (Bankr. M.D. Fla. Dec. 7, 2020).

Finally, as a matter of public policy, the decision below would encourage rather than deter illegal conduct, since it signals malefactors that they can engage in prohibited conduct and reasonably believe that they will not be caught or punished.

As a court of equity, the Bankruptcy Court must eschew an inequitable result and deny relief to a litigant with unclean hands. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). The result below allows Esteva to escape with his ill-gotten gains.

### ii.    Otero Provided No Consideration.

Appellees also succeeded in their unprecedented argument that "upon marriage each spouse's income during the marriage is marital income" and that inter-spousal transfers of such income can be made with impunity. Our research has revealed no case in Florida or any other equitable distribution jurisdiction that has accepted this proposition in any context, much less as a defense to an otherwise fraudulent transfer.

In equitable distribution states like Florida, in contrast to community property states like California, it is black letter law that the concept of marital income or property does not come into play unless and until there is a divorce between the spouses. *See In re Roberge*, 188 B.R. 366 (E.D. Va. 1995) (construing Florida law to vest right to equitable distribution of marital property upon the filing of a divorce action); Julia Halloran McLaughlin, *Should Marital Property Rights Be Inalienable? Preserving the Marriage Ante*, 82 NEB. L. REV. 460, 463 n. 11 (2003) ("marital property rights are inchoate unless and until a divorce action is filed"); *accord, In re Cooper*, 81 N.C. App. 27, 31 n. 2 (1986); *Garver v. Garver*, 253 A.D.2d 512, 677

37

N.Y.S.2d 155 (2d Dep't 1998); *Brown v. Brown*, 2013 U.S. Dist. LEXIS 74323, \*28 (E.D. Ky. 2013) ("a spouse's interest in marital property vests when divorce proceedings commence").   In fact, even in community property states such as California where spouses obtain rights in community assets and income during a marriage without divorce, the courts have held that the Uniform Fraudulent Transfers Act would still apply to negate an inter-spousal transfer made without consideration.   *See Sturm v. Moyer*, 32 Cal. App.5th 299, 243 Cal. Rptr.3d 556 (2019).

To support its revolutionary proposition, the Bankruptcy Court cited two cases, *Rosenfeld v. Rosenfeld*, 597 So.2d 835 (Fla. 3d DCA 1992) and *Steiner v. Steiner*, 746 So.2d 1149 (Fla. 2d DCA 1999).   Neither decision is applicable to support the unprecedented basis on which the court premised its holding.   **Both cases involved pending divorces between the spouses**.   In *Rosenfeld*, the wife was claiming that the husband's dissipation of assets or income during the marriage should be considered in their equitable distribution of marital property.   In *Steiner*, the only issue was whether an account containing commingled separate and marital funds was subject to equitable distribution.   These are both unremarkable holdings which do not create a choate right to the other spouse's property during an intact marriage.

Unlike the present case, the Steiners' and Rosenfelds' marital rights against each other had vested and were being litigated between them. In the present case, of course, there is no divorce pending. Indeed, the parties are acting together, represented by the same counsel, and relying on their unity and continued marital bonds to shield the House Account.

Furthermore, while the court below characterized the $2 million deposit as "marital property," in reality, as the court itself noted in a different context, the funds were not "income" or "assets" but, rather, encumbered loan proceeds. If the court's reasoning were followed to its logical extension, the loan would be a marital debt, subject to equitable distribution between the spouses in the same fashion as marital assets. **In other words, the court could not find that Otero had a marital right to a portion of the loan proceeds without also adjudicating her equally liable for the corresponding debt to UBS.** *See* Fla. Stat. § 61.075(1)("in distributing the marital assets **and liabilities** between the parties, the court must begin with the premise that the distribution should be equal, unless there is a justification for an unequal distribution . . .")(emphasis added). Subsection (6) goes on to define "Marital assets and liabilities" to include "liabilities incurred during the marriage, individually by either spouse or jointly by them."

Moreover, a divorce between the parties would sever the tenancy-by-the-entirety, eliminating the immunity on which appellees rely. *See Nationsbank, N.A. v. Coastal Utils., Inc.*, 814 So. 2d at 1230.

Once again, appellees cannot have their cake and eat it too. If, *arguendo,* each spouse had a marital right to the loan proceeds, they would each have a corresponding obligation for the attendant debt. In sum, appellees cannot argue on the one hand that divorce law granted Otero with a choate interest in the loan proceeds without conceding on the other hand the exposure of the account to creditors that divorce law would create.

That aside, the lower court's reasoning, if allowed to stand, would create an exception that would largely swallow the fraudulent transfer rules. Under Fla. Stat. § 726.102(8), (13) and §726.105 (2)(a), transfer to a "spouse" is prima facie suspect. *See also Perrott v. Frankie*, 605 So.2d 118 (Fla. 2d DCA 1992). Under the ruling on appeal, any Floridian in debt to another could flout his or her obligation with impunity by depositing the proceeds of a loan or other assets into a tenancy-by-the-entirety account, filing for bankruptcy, and claiming an exemption from creditors for the House Account. It bears repeating that Esteva is a serious wrongdoer seeking ill-gotten gains.

**B. Liability Under Section 726.106.**

As an alternative to Section 726.105, Section 726.106 provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  By filing his bankruptcy petition not long after depositing the loan proceeds into the joint account with his wife, Esteva has effectively admitted his insolvency.  And he became insolvent as a result of the transfer because, had he not deposited the loan proceeds into the exempt account with his wife, he would have had ample funds to repay UBS and any other creditors.  Notably, the statutory requirement is that he "became insolvent as a result of the transfer," *not* that he became insolvent contemporaneously with the transfer.  This alternative basis for liability was ignored below.

Summary judgment is inappropriate under Chapter 726 in any event, as "[s]ummary judgment is available in fraud cases only in extraordinary circumstances."  *Stephens v. Kies Oil Co., Inc*., 386 So. 2d 1289, 1290 (Fla. 3d DCA 1980).[17]

---

[17] Esteva contends also that the transfers were "balance sheet neutral" because the transfers were "advances of future earnings, not loan proceeds" and Esteva thereby "received a corresponding

Reversal is further warranted by the Supreme Court's recent opinion in *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023). To be sure, in *Bartenwerfer*, unlike the present case, the spouse accused of participation in a fraudulent transfer was the debtor. This distinction is immaterial, however, as *Bartenwerfer* enunciates the policy of the Bankruptcy Code that the remedies for transfer without consideration follow the money, not the perpetrator. It matters not that Otero allegedly did not participate in her husband's fraudulent activity or even, arguendo, that she was ignorant of his schemes or the taint on the funds. In the Supreme Court's introductory words:

> The Bankruptcy Code strikes a balance between the interests of insolvent debtors and their creditors. It generally allows debtors to discharge all prebankruptcy liabilities, but it makes exceptions when, in Congress's judgment, the creditor's interest in recovering a particular debt outweighs the debtor's interest in a fresh start. One such exception bars debtors from discharging any debt for money "obtained by . . . fraud." 11 U. S. C. §523(a)(2)(A). The provision obviously applies to a debtor who was the fraudster. But sometimes a debtor is liable for fraud that she did not personally commit—for example, deceit practiced by a partner or an agent. We must decide whether the bar extends to this situation too. It does. **Written in the passive voice, §523(a)(2)(A) turns on how the money was obtained, not who committed fraud to obtain it.** (Emphasis added.)

---

receivable due him." Doc 28 – Pg 22. This theory just resurrects his thoroughly debunked argument that a loan constitutes earnings rather than borrowings, an argument rejected by the Bankruptcy Court.

In fact, the Supreme Court cited its venerable ruling in *Strang v. Bradner*, 114 U. S. 555, 561 (1885), where, as here, debtors who had "appropriated the fruits of the fraudulent conduct" were denied a discharge of the debt. "And the reason for this rule was particularly easy to see because 'the partners, who were not themselves guilty of wrong, received and appropriated the fruits of the fraudulent conduct of their associate in business.'" *Id.*

That only one of the plaintiffs below, Esteva, is a debtor, is a distinction without substance. Otero received her interest in the ill-gotten loan proceeds without any consideration. The policy underlying Section 523 is the protection of creditors against fraudulent transfers, actual or constructive.

## IV

## UBS HAS A RIGHT OF SETOFF IN TANDEM WITH ITS SECURITY INTEREST

Counts III and IV of UBS's counterclaim should be reinstated for reasons similar to those warranting reversal on the lien issue. These two Counts seek a determination that UBS may set off the funds owed by Appellees to UBS against Appellees' claimed interest in the House Account. UBS has the right to setoff pursuant to 11 U.S.C. § 553(a) and the CRA. Doc 29 - Pg 36.

Appellees claim that they have an interest in the House Account, which Esteva listed on his initial bankruptcy schedules as a debt owed to UBS. Doc 1 – Pg 5; Doc

9 – Pg 5.  Thus, both appellees and UBS claim that the other owes them the contents of the House Account.  Both claims arose before Esteva filed for bankruptcy.

Questions of setoff are governed by Section 553 of the Bankruptcy Code.  *In re Dillard Ford, Inc.*, 940 F.2d 1507, 1512 (11th Cir. 1991).  Pursuant to Section 553(a), "a creditor [may] offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case. . . ."  11 U.S.C. § 553(a).  "Setoff, which may be exercised either pre-petition or post-petition, is based upon the right of mutual debts."  *In re Moses*, 91 B.R. 994, 996 (Bankr. M.D. Fla. 1988) (citations omitted).  The mutual debts must have both been owed either pre-petition or post-petition.  *Id.* (citations omitted).  A creditor's claim is secured to the extent of the amount eligible to be setoff.  *See In re Patterson*, 967 F.2d 505, 508-09 (11th Cir. 1992).

Section 553, however, looks to applicable non-bankruptcy law to determine the resulting setoff in a particular case.  *See id.* at 509.  Consequently, having established that setoff is permissible, we turn to a review of applicable non-bankruptcy law.  *See In re MCB Fin. Group, Inc.*, 461 B.R. 914, 919 (Bankr. N.D. Ga. 2011).  Pursuant to Florida law, a promissory note agreement that gives the lender a right of setoff is enforceable.  *See id.* (citations omitted).  Additionally, Florida recognizes a common law right of setoff, including setoff in favor of

44

financial institutions.  *See Ebsary Found. Co. v. Barnett Bank of S. Fla., N.A.*, 569 So.2d 806, 807 (Fla. 3d DCA 1990) (citations omitted).

Pursuant to the CRA, UBS has a right of setoff:

> We [UBS] may satisfy any and all amounts you owe us in connection with any of your Accounts or agreements with us, or **any other agreement between you and any UBS Entity, including but not limited to any loans, promissory notes** or tax obligations, from Property we hold or carry in any of your Accounts with us. . . .  Doc 29 – Pg 36 (emphasis supplied).

Thus, the CRA unambiguously granted UBS the right to set off debts owed to UBS against the assets held in the House Account.  Moreover, as stated above, UBS also has a common law right to setoff.  *See Ebsary Found. Co.*, 569 So. 2d at 807. Appellees have proffered no authority for the proposition that tenants-by-the-entirety are immune from setoff.  Accordingly, it was error for the court to have dismissed Counts III and IV of the counterclaims.

## V

## SUMMARY JUDGMENT ON COUNT 4 OF THE COMPLAINT MUST FALL IN LIGHT OF THE UBS LIEN

Appellees also obtained partial summary judgment on the part of their Count 4 alleging that the UBS claim is unsecured.  Because, for the reasons set forth above, UBS has a valid security interest in the House Account, this ruling must be reversed as a matter of course.

**VI**

**SUMMARY JUDGMENT WAS**
**IMPROPER IN THE FACE OF**
**QUESTIONS OF FACT**

Although we submit that there are no questions of fact surrounding the validity of UBS's lien, at the very least the Bankruptcy Court should have refrained from granting summary judgment in appellees' favor because appellees' motion implicated material issues of fact.  Pursuant to Fed. R. Bankr. P. 7056, Fed. R. Civ. P. 56 governs motions for summary judgment.  The Eleventh Circuit summarized the heavy burden of a movant in *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838 (11th Cir. 1985):

> A party seeking summary judgment bears the burden of demonstrating that no genuine dispute exists as to any material fact in the case. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Clemons v. Dougherty County, Georgia*, 684 F.2d 1365 (11th Cir. 1982). In determining whether a movant has met this burden, we review the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S. Ct. at 1608. All reasonable doubts about the facts are resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Insurance Co.*, 655 F.2d 598, 602 (5th Cir. 1981). If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Impossible Electronics Tech-niques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. Unit B 1982); *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir. 1970).

Summary judgment is proper only where the pleadings and discovery exhibit that there is "no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. at 322; Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260 (citations omitted).

Although summary judgment is a useful device, it must be used cautiously, or it may lead to drastic and lethal results. *See Hanson v. Polk County Land, Inc.*, 608 F.2d 129, 130 (5th Cir. 1979). The non-movant's burden in resisting the motion is not a heavy one. *Securities & Exchange Commission v. Spence & Green*, 612 F.2d 896, 901 (5th Cir. 1980). Indeed, summary judgment in fraud cases is reserved for extraordinary circumstances. *Advest, Inc. v. Rader*, 743 F. Supp. 851, 855 (S.D. Fla. 1990). If anything, summary judgment could and should be granted in favor of **UBS** under Rule 56(f) because all of the operative documents here explicitly support UBS's position and belie that of appellees. *Id.;*[18] *see also* James Joseph Duane, *The Four Greatest Myths About Summary Judgment*, 52 WASH. & LEE L. REV. 1523, 1591 (1995).

---

[18] Summary judgment in *Advest* was granted to the **creditor**, where the husband's documented transfer of his funds to a joint account with his wife made out a *prima facie* case that the defendants could not rebut.

The material questions of fact include:

- Whether Esteva acted with intent to hinder, delay or defraud UBS or other creditors.

- Whether Esteva believed or reasonably should have believed when he signed the notes and transferred an interest in the proceeds to his wife in the midst of ongoing illegal activity that he would incur debts beyond his ability to pay as they became due.

- Whether, if there were an ambiguity in the CRA, the parties intended that the lien applied to Otero as well as Esteva.

These fact-sensitive issues should have precluded summary judgment in appellees' favor.

## VII

### The Court Has Jurisdiction<br>To Hear this Appeal

This Court has raised a jurisdictional issue relating to the present appeal. The Court has asked the parties to respond in regard to whether this appeal concerns a core versus a non-core issue and, if it relates to a non-core issue, whether the Bankruptcy Court had jurisdiction to enter a final judgment in regard to the issue. Stated simply, in response to the Court's jurisdictional inquiry, the issue involved in this appeal relates to core a bankruptcy issue because it directly relates to the

bankruptcy estate for distribution to creditors, the determination of the validity and extent of a lien claimed by UBS, and the turnover of property to the estate under 11 U.S.C. §542. Notably, the Complaint alleges that the matters set forth in the Complaint are core proceedings under 28 U.S.C. §157(b)(2)(A), (B), (E), (K) and (O). Doc. 1, p.2, ¶2. In the Answer and Affirmative Defenses to Plaintiffs' Adversary Complaint and Counterclaim, UBS agrees. Doc 9, p. 2, ¶2.

As the Bankruptcy Court has determined, and Debtor Esteva concedes, the key to his reorganization under Chapter 11 is the availability of the assets held in a UBS account, the House Account. Doc. 241, pp. 5-6, ¶10 (recognizing that the Plan is feasible only if the Court affirms the Partial Final Judgment); Doc. 219, pp. 9-10, Art. 3.1C (recognizing that the Plan is feasible only if the Court affirms the Partial Final Judgment); Doc. 217, p. 9, Art. VI, §6.1 (plan contingent upon this Court affirming the Partial Final Judgment).

If the assets in the House Account belong to the estate, then Debtor Esteva has assets to divide among his creditors. If the assets belong to UBS, then Debtor Esteva does not have any estate and no reorganization will occur.

Under 28 U.S.C. §157(b)(2)(A), "core proceedings" include "matters concerning the administration of the estate[.]" As discussed above, the Partial Final Judgment entered by the Bankruptcy Court, Doc. 66, directly concerns

administration of Debtor Esteva's estate because no estate exists if the proceeds from the account at issue belong to UBS.

Under 28 U.S.C. §157(b)(2)(B), "core proceedings" include "allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11[.]" As discussed above, the Partial Final Judgment entered by the Bankruptcy Court, Doc. 66, directly concerns administration of Debtor Esteva's estate because no estate exists if the proceeds from the account at issue belong to UBS.

Under 28 U.S.C. §157(b)(2)(E), "core proceedings" include "orders to turn over property of the estate[.]" The Partial Final Judgment, requires UBS to turn over the House Account. Doc. 66, p.2, ¶1.

Under 28 U.S.C. §157(b)(2)(K), "core proceedings" include "determinations of the validity, extent, or priority of liens[.]" The Partial Final Judgment determines that UBS does not have a lien on the House Account.

Under 28 U.S.C. §157(b)(2)(O), "core proceedings" include "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims[.]" Debtor Esteva's claims against UBS do not involve "personal injury tort or wrongful death claims[.]" The Partial Final Judgment adjusts

the debtor-creditor relationship between Debtor Esteva and UBS by finding that UBS does not have a claim to the assets in the House Account.

In sum, the plain language of 28 U.S.C. §157(b) makes clear that the claims at issue in the Bankruptcy Court concern "core proceedings" within the purview of that statute. As a result, the Bankruptcy Court had jurisdiction to enter a judgment in regard to those claims. And, this Court has jurisdiction to entertain this appeal. Indeed, as explained below, the cases cited by the Court in its order granting permission for a direct appeal support this conclusion. [23-14050, Doc. 1-2; 8-2].

In *Wortley v. Bakst*, 844 F.3d 1313, 1319-20 (11th Cir. 2017) (bankruptcy court did not have jurisdiction to enter final judgment regarding non-core state law claims of conspiracy to obstruct due operation of law and fraudulent corruption of judicial process against counsel for bankruptcy trustee), the Court concluded that the case did not involve a "core proceeding." As established above, the ruling under appeal in this case involves a "core proceeding" under 28 U.S.C. §157(b)(2)(A), (B), (E), (K) and (O). Notably, citing its decision in *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir. 1990), the *Wortley* court characterized a non-core proceeding for which the Bankruptcy Court could enter a final judgment as one that conceivably could affect the bankruptcy estate. *Wortley*, 844 F. 3d at 1320. As discussed above, no bankruptcy estate exists without the assets from the

51

Joint House Account. This Court's decision in this appeal most definitely concerns a bankruptcy court final judgment that affects the bankruptcy estate.

In *Stern v. Marshall*, 564 U.S. 462 (2011), the Supreme Court held that the bankruptcy court lacked jurisdiction to enter judgment on the debtor's state law counterclaim for the alleged tortious interference with an intended gift from the debtor's deceased spouse. Thus, unlike the instant matter, the decision in *Stern* did not involve a core proceeding.

In *USF Fed. Credit Union v. Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.)*, 983 F. 3d 1239(11th Cir. 2020),  the court addressed both a core and a non-core issue, finding that the bankruptcy court had jurisdiction to enter final judgment on the core issue, but that it did not have jurisdiction to enter a final judgment on the non-core issue. The core issue related to the ability of the debtor to borrow money from the Small Business Administration under the Paycheck Protection Program. The non-core issue concerned the bankruptcy court's preliminary injunction against the SBA enforcing its non-bankruptcy eligibility rule. As discussed above, the bankruptcy court's Partial Final Judgment concerns a core issue. Thus, under the decision in *Gateway Radiology Consultants, P.A.*, this Court has jurisdiction.

## CONCLUSION

Because the CRA was signed by both appellees and by its explicit terms secures any agreement of either of them with UBS, and because the fraudulent conveyance claims were susceptible of inferences favoring defendants and not preempted by the laws of marital property, summary judgment was improper and should be reversed.

## CERTIFICATE OF COMPLIANCE REGARDING WORD COUNT

The undersigned certifies that the word count in this brief is 12,974.

Dated:  January 25, 2024

Respectfully submitted,

/s/ *Alex J. Sabo*_____
Alex J. Sabo, Esq.
Florida Bar No.: 262821
**BRESSLER, AMERY & ROSS, P.C.**
515 East Las Olas Boulevard, Suite 800
Ft. Lauderdale, FL 33301
Phone: (305) 501-5480
Fax: (305) 501-5499
Email: asabo@bressler.com
*Counsel for Appellants UBS Credit Corp.*
    *and UBS Financial Services, Inc.*

53

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 25, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel or parties of record via electronic filing notice generated by CM/ECF to counsel of record.

*s/ Alex J. Sabo*
Alex J. Sabo, Esq.